and it troubled me for a long time as I was getting ready as to why it kept bothering me. And I finally realized a couple of days ago it's because Bond, unlike every other Federal Tort Claims Act case I have ever read, doesn't tell us what the government's negligence was. It gives us the facts of the case and it says the government was negligent and Bond loses. But it doesn't say what the government did wrong. Bond, if you can remember, is the San Diego case. The sailor rented the canoe and was boating either on or just near the premises of the Special Services Center when she was struck by a motorboat that was being operated by another active duty Navy member who had also gotten it from Special Services. But the case doesn't tell us what the government did wrong. I thought maybe they had the appellate briefs here on file. They've put them to someplace called El Bruno. They're in the archives. I've asked an expert to get them back and I will make a motion to supplement the record on appeal with the actual reasons behind the court's decision in McConnell, which do not appear anywhere on any resource that I could get, internet or otherwise. I think fundamentally the reason for what must have been going on in Bond was that the government had negligently given the motorboat to the individual who was operating it or had negligently set up its program in such a way that it did not supervise the motorboat operator. And there you've got a tremendous amount of government involvement in the management, operation, and discipline of the activity that's going on. Here, by contrast, you have the breach of a very simple ministerial duty. We have a motorboat which had a throttle control cable that failed. What we've alleged in the complaint and what we will prove at trial if we can get there is that this was simply negligent maintenance, negligent inspection. In Arizona, there is a non-delegable duty when you are renting out this kind of device to inspect it every once in a while, to maintain it properly, to make sure that it's all right. It's a very simple duty. It doesn't involve decision-making. It doesn't involve military discipline, military mission. It doesn't involve anything like that. It's simply this is something you are renting out to people. Take a look at it once in a while. Make sure that the essential parts are not worn out, frayed in this instance, defective. Very simple. There is no impingement here in having a civil suit against the government. There is no impingement on essential military discipline, on the military mission, on anything like that. Let me ask you this. I think all that you state is true up to this point, but we also have to deal with the fact that the boat, that using the boat was pursuant to the, I believe, actually, Your Honors, that it's a false trail. There is no hint that any of the military members on the lake did anything wrong at all. Even Lieutenant Frosham, who was actually operating the throttle control when the cable broke, there was no negligence on his part whatsoever. The only, the situs of the negligence and the final culmination, I think, would be at the lake. But if you look at the actual actions that led to the final culmination of negligence, it's simply a failure on the part of the government to do the non-delegable duty that is imposed upon it as a matter of routine law. Well, but this sort of program seemed to be a factor in the cost, I keep wanting to say Costco, but the Costco case. And so I think that we have to factor it in as one of the components, but I'm asking you how you would distinguish your case from Costco. All right. First of all, and if I may take it in two parts, the first one is very short. I think also it's a false trail, because what happened at the Luke Air Force Base was simply the failure to take care of a piece of equipment. Costco is so far removed. What you had there, what was alleged had occurred, two sailors in a rafting trip, they are caught in an undertow on the river, trapped by the branches of a submerged log, and they die. And on the surface it looks a little bit like our case, but what happened there, it was a Navy-led, Navy-devised, Navy-supervised program in all aspects. The Navy hired the guides who went on the program. They were civilian employees under the control of the Navy. And what was alleged, that there was a failure to get a rafting permit, a failure to hire trained guides, a failure to supervise the guides, a failure to scout out the river, a failure to warn of the river's dangers, a failure to properly equip the rafts, a failure to properly instruct the rafters, and then, after the accident started, a failure to rescue and a failure to give first aid. Government involvement in Costco was all pervasive, from the very inception of the program, from the creation of the program, from the supervision of the program, to the supervision of the particular rafting trip, and to all the steps that were taken or not taken after the accident started to rescue the two sailors. The level of control was immense. Do you think it's significant in this case that one of the, assuming that all the negligence is that of the maintenance and the government, which I think can be a fair assumption in this case, is it significant that the maintenance of the boat is on the base? I don't think so. I think that it's such a tenuous relationship, and I know we're making a bit of a distinction here, but that is what the Federal Tort Claims Act is about. It is about making these fine distinctions. Well, they are all very fine. It's a difficult area. It's the place of the negligence. It's usually considered the place of the negligence in relation to the accident and in relation to the status of the service member. This boat was purchased in 1990. We don't even have a clue as to when the actual negligence came to its culmination, in the sense that the boat was already in danger and would just be a second's use away before it would snap. We don't know when that happened. It may have been that Lieutenant Frosham hit the throttle in a very particular precise way that culminated in the injury. It may have been that this was an injury that would have happened five years earlier. We don't even know when the negligence culminated whether Lieutenant McConnell was in the service or not. I mean, he was, after all, a student pilot and had not been in the military that long. So, I mean, I think it's a false trail once again, and the relationship is tenuous. And when I talk about fine distinctions, I also need to talk about qualifiers. The Ferries Doctrine is based upon qualifications. It's not just incident to service. It's a reasonably incident to service or relevant to service. And it's not just an effect on military discipline, which has become the main justification for ferries. It is an effect on essential military discipline. It will not affect military discipline in the slightest or the mission of Luke Air Force Base or the United States Air Force in the slightest. If the government is held responsible for this simple act of negligence, non-delegable duty, that it failed to perform. Let me ask you a quick question. Thank you. I have a question for you, counsel. As you know, our panel is bound by costo and by bond. So you are arguing to distinguish those cases, which is the only way. We could only give relief to a felon if we could persuasively explain how this case is different. But at the Supreme Court or on an end bank case, you'd be free to argue that, I guess, costo and bond were improperly decided. So I wanted to ask you, based on your discussion of the purported decision, the distinctions of costo and the suggestion that the government involvement was pervasive there, do you think costo is a correct application of the Ferris Doctrine? Your Honor, I do. And the reason is that the entire program, not only in its inception, all the details of the program, plus its implementation and the actual events that occurred on the river, every step of the way was under pervasive military control and involved scores, literally, of decisions. Do we set up a program like this in the first place? If so, how do we set it up? How do we select the guides that are supposed to deal with the program? What qualifications do they need? How do we select the rivers to go on? How do we scout out the rivers? How do we prepare the people who are going to go on the rafts? What kind of rafts do we use? And if there is a problem on the rafting trip, what do we do? Not only is this – there are a host of military decisions in the inception and construction and implementation of the program. There were actually government employees there. There were civilian employees and designees of the United States Navy there from A to Z, right until they pulled the bodies out of the water. So, I mean, this is such a pervasive military control with so many pervasive military decisions that I believe that there would be an impact on military discipline if you were to question all of that. We're not questioning all of that sort of stuff in our case. We're just saying you have a duty to take care of the boat. Maintain it. Inspect it. And that's all. So I understand your distinction on costo, on bond. I was understanding your argument to be that you think there may be a distinction in terms of the nature of the negligence that was underlying that case, but you're not yet able to determine because the opinion didn't recite it what the alleged negligence was. I believe you're fairly accurate, but I would add some qualifications. First of all, this is literally the only Federal Tort Claims Act decision like it, and I am, of course, staking my reputation on it. If you read through case after case, you'll find they always say what the government's negligence was. Here in bond they don't. But I believe it is a logical imperative. I'm not just guessing here. I'm making an educated assumption. I'm making an educated formulation of what I know must be there. It must be something that the special services did as far as selecting to whom it would give its boat or how the motorboat program would be operated, and that would involve extensive military decisions, not maintenance of the boat, not a question of, well, did we take care of the throttle or not, but to whom do we give it and how do we supervise operation of the motorboat. I had thought possibly that bond was saying, well, the other sailor was negligent and the other sailor was on active duty and, therefore, acting as an agent of the United States government, sort of like the Brooks case. But that wouldn't make any sense at all because the bond decision, if it's clear on anything, it's clear on the fact that these were off-duty military members not acting within the scope and course of their military duties. So it can't be that. It's got to be something directly done by the special services center in relationship to the actual operation of its program. That is pervasive military control. That would involve maybe not scores of military decisions, but certainly more than a handful. That would interfere with the military mission and military discipline to a great extent. I need to ask you a question about that while you're on bond and while we're on the facts of our case, that the record suggests that Mr. McConnell received instruction on the use of the boat, and I'm taking that from the declaration of Lieutenant Colonel, I think it's Graham, which was Exhibit No. 3 to Defendant's Summary Judgment in the original district court. It's not in the excerpt of record. The question I have is, does this make the case more similar to bond, where the court found the plaintiff was subject to military orders and regulations for the particular activity? No, and I don't think so for two reasons. The first was one of these short, general ones. Any time you're in the military, you're subject to military orders when you're on active duty. If you do things that are unbecoming to the service or that are contrary to military discipline, and that would include such a thing as misusing government property, then you are subject to military discipline. But that is something that is always in the background. It's just a factor in every single Federal Tort Claims Act that involves active duty military personnel, and therefore I don't think it's a factor that matters. What's important is whether you are actually on duty in the sense of doing your military duties or off duty. That's the important factor. All right. I think we've used your time. Well, we've gone over because we had additional questions. Can I finish my answer? Sure. And then after that, unless there's further questions, I'm going to move to the appellee. The second part was whether there was any ‑‑ I think the word was briefing, that Lieutenant McConnell may have received about the use of government property that's in this morale and welfare program. And I think that also is a false trail because, once again, there was no negligence, no misuse by anybody at the lake of the government property that day. All right. Thank you. I'll give you a minute on rebuttal. Thank you. It's very gracious. I appreciate it. Thank you. Good morning. Good morning. May it please the Court, my name is Peter Lantka, and I represent the defendant, United States of America, and respectfully request that this Court affirm the district court's decision denying plaintiff's claim for lack of subject matter jurisdiction under the doctrine articulated in Ferris v. United States. As Your Honors are well aware, the Ferris doctrine is quite expansive, and it denies all tort claims against the United States that the underlying tort either arises out of or is incident to the serviceman's military service. Now, because of the discrepancy in the factual circumstances of individual FDCA claims under the Ferris doctrine, Your Honors, this Court is bound by its prior decisions, and which is why Judge Teelborg ruled correctly, because Mr. McConnell's situation is on all fours with this Court's 2001 decision in Costo and the 1986 decision in Bonn. All right. Well, you're relying, obviously, on Costo and Bonn, but, you know, the cases that I think that you need to address on the other side of it, say, you know, for example, given in this situation Mr. McConnell did not rent the boat, was off duty and was off base when he was injured, why isn't this case more similar to Brooks? Or what facts support your, you know, contention that Mr. McConnell was subject to military discipline more than the service members in Dreyer? I think this case is very dissimilar to Dreyer. Dreyer, as you remember, was when a serviceman was drunk on a beach and fell in a ravine. And as well, the plaintiff contends that the problem that we have here is the actual negligence. As the United States pointed out in its underlying briefs, where the negligence happened is less significant than the relationship of the actual serviceman to the recreational activity and to the military themselves. What this Court found in Dreyer and the Johnson case was that the actual injured serviceman or the deceased serviceman was indistinguishable from a civilian. In the Dreyer decision, anyone was found to be able to walk onto that beach, even though there was a regulation, it was not active, and the military could have injured a serviceman falling into a ravine just as it could have injured a civilian. I want to point out a case relied on in the Dreyer decision, Millang v. United States at 817 F. 2nd, 533. This was a picnic, and I believe it was on a Marine base, Your Honors, where there was some horseplay and alcohol consumption and a small child almost was run over by a military jeep, where a Marine then pushed the child out of the way and was killed. This Court found that that Marine suit was barred under the Ferris doctrine because everyone's access to that picnic, you had to be either accompanied by a servicemember or under the supervision of a servicemember. That picnic, Your Honors, is no different than the boat. Defendants' Exhibit 3, paragraph 11, the declaration states that these servicemen were briefed on the relationship and their duties according to the boat. This was a benefit of their service. Civilians would not access the boat, nor could they unless they were closely related or under the supervision of a military member. So in answer to your question, Your Honor, this case is part and parcel. The access to the boat by Lieutenant McConnell Forge from Donahue is because they were members of the United States Air Force. It was a heavily regulated activity. If you'll read the submissions which the United States made in both the District Court and to this Court, the Standards for Air Force Instruction, Section 34-262, state how the Office of Outdoor Recreational Facility and the Morale, Welfare, and Benefit Fund were an integral part of the training of F-16 pilots at the Air Force Base. It improved morale. It helped ease tension. And it was heavily regulated by access to these materials. But now to rent this boat, someone had to be, you know, it was part of the program, but couldn't other people be along with them that were not pilots? Yes, Your Honor, and that is the exact same regulation which the Bond case had, that a civilian could have access to the boat so long as they were either accompanied by and under the direct supervision of a serviceman. Now, Plaintiff in his submissions, although he didn't make a big deal out of it here today, did address that as one of the primary distinguishing factors between this case and others. But if you look at the Malang decision and the Bond decision, which were distinguished from Dreyer and Johnson, the difference is in those situations, the fact that the injured servicemen were in the service was no different than me working for the Department of Justice or Mr. Abney working in private practice. The injury could have occurred anywhere. Similar to the 1949 Brooks case, all we dealt with was an auto accident between a military vehicle. The difference here is the whole access to this recreation facility, whether it's a basketball court on the military base or a pair of rented water skis, rope, and a boat that you take a half-hour drive away to Lake Pleasant to go water skiing, the only reason that they're on that boat is because they're members of the military. I point out again, footnote four in the Bond decision, it says these regulations are enough to bring this suit within the ambit of the Ferris Doctrine. Well, now, obviously, the location is off base, right? Yes. We have very little water in the desert. Is there what significance, I ask this to appellants counsel, do you attach to the fact that the maintenance of the boat occurs on base? Is that of any significance? I think that is of great significance. The Johnson, the Supreme Court Johnson case listed the four factors in an incident to service test, the first of which was the situs of where the negligence occurred. And under a 12B1 standard, which is what Judge Teelborg ruled under, similar to Rule 56, when there is some discrepancies or issues of fact, we have to give deference to the pleading. And if we are to believe plaintiffs, which the United States posits may be incorrect, but if we are to believe the plaintiffs, the actual negligence here was in the maintenance, the supervision, and the routine governance of that boat. And that happened on base. Well, and for purposes of this, they're entitled to all inferences in their favor on that, right? Correct. And going in their favor, it really helps us out, Your Honor. And if you look at the Costo decision, all that the military did with this off-base rafting trip were hired two independent contractors, which more or less took over the whole trip for them. No servicemen went out and plotted this course. No servicemen went out with the rafts except for the ones who were enjoying the recreational activity. They hired a couple people to do a boat trip. They screwed up when the boats hit a log. And what the Costo court, what the Ninth Circuit found in that situation was the full ambit of military oversight was simply regulatory or supervisory in how to hire these people in deciding what Navy servicemen went on those boats. That happened here in spades, Your Honor. The situs of the negligence was truly military regulations. Again, the standards for Air Force instruction, the morale, welfare, and recreation fund, it all happened on the base, and it just happened to occur a couple miles down the road where they had access to water. The second thing we need to point out in the incident to service test, Your Honor, is the duty status. The fact that these men were on active duty at the time, as this Court stated in the Johnson decision and in the Dreyer decision, bears on the relationship between the plaintiff and the military. Again, Lieutenant McConnell, Donahue, Fortune, and Crowell would not have had access to these recreational facilities, to this boat, to the water skis, to the transportation to the lake, had they not been lieutenants in the F-16 fighter program. That leads to the third and fourth prong of the incident to service test, Your Honor. The benefits accruing to these servicemen were because of their status as military trainees at the Luke Air Force Base. And I think I would like to just point out again that plaintiff conceded the Costo case is controlling and that if you look at the distinctions between the relationship of a military serviceman in the Dreyer and Johnson case comparing them. Oh, I guess he said, I mean, that we have to follow it. But he's – I think he is not saying it's dispositive, I guess. He's distinguishing his facts. I would point out again that the Court reluctantly followed the precedent in Costo. But I think we have to here because I think this case is almost more squarely within the Ferris doctrine than the Costo decision because of the situs of the negligent case. Explain why you think that is, why this case is more within Ferris than Costo. I thought that the appellant was arguing that in Costo the regulation was more pervasive. And, you know, if the government hired contractors to be at the place where the rafts were used so their agents are watching everything being done, you know, in that sense the government is there throughout. So how is this case more under Ferris than Costo in your view? In my view the case is akin to the Bond decision, Your Honor, and it falls more under Ferris because of the situs of the actual negligence. This is a maintenance advisory issue deciding who gets this boat and how we take care of the throttle wire that all occurred on the Luke Air Force base. So the maintenance is on the base. Then explain your position as to why giving the appellants a remedy for negligent maintenance would interfere with military discipline or any other vital U.S. interest. I think Your Honor is referring to the three policy concerns articulated in Ferris in 1950. It would very much so if you look at the citations the United States made to the Air Force regulations for training and service, that they found that the recreational facilities and the use of recreational programs were an integral part of the training of United States servicemen. That's why you have a morale, welfare, and recreation fund. Because of that, the whole access to these programs, the governance of these programs, the availability of them are part of the training mission of the United States military. In order to train them, we need to train them to fly F-16s. We also need to train them to be part of the Air Force and have an esprit de corps. And that's where the recreational funds fall in. I see my time has expired. I might conclude in one sentence. If I could ask one additional question, Judge Callahan, I'd appreciate it. You can ask as many as you want. Well, my question that I still don't understand is how does the government, how would the government address appellant's argument that we don't know from the opinion what the negligence was that was asserted in Vaughn? So in that sense, we don't know if it was distinguishable. The government asserted both before the district court and in its appeal briefs, Your Honor, that the actual type of negligence was not dispositive. And I think Attorney Harris stated it didn't even matter as to whether or not Ferris barred suit. The dispositive issues are that they were on active duty at the time, their access to the recreational facilities were a benefit of their military status, and the access and use of this boat and the availability of recreational facilities were under the command of the 56th Fighter Wing. Those are the dispositive issues in Vaughn and Costco, not what type of negligence occurred. Whether or not we are alleging it was Mr. Johnson's fault or the base's fault really doesn't matter, Your Honor. For these reasons, the United States, as well as those in the briefs, would urge that we affirm the district court's decision. Thank you, Your Honor. Thank you for your argument. Thank you for the opportunity to say a few more words. This is one of those things we could be here for hours and hours. But Costco, if you take a close look at it, the government control was as pervasive, as I had mentioned before, from the plaintiffs in Costco alleged that there were nine different ways that the government was negligent, starting with the inception of the program, its initial operations, scouting the river, to all the way to rescue. What does negligence really have to do with it other than looking for the situs of the negligence as one element? Once you decide situs, does it really matter what the negligence was? It matters a great deal because that tells us how much involvement there was as far as military decision-making, how much involvement there would be as far as military decision, as far as military discipline. In Costco, the conduct of the government and the decisions that were made were literally legion. It controlled the entire program, and it had its agents there actually when the accident happened, both before, during, and after. Well, if I wanted to make that contrary argument, if the court felt that, if the court felt in a published opinion that that was relevant to their reasoning, why wouldn't they include it? Your Honor. I mean, you know, that's a judge question. It is a judge question. And I wish I knew. And it's one of those things that's like the dog that's not barking in the night. You don't even realize it's not there until you think about it long enough and realize that this is the only Federal Tort Claims Act case that doesn't tell us what the government did wrong. If you don't know what the government did wrong, you don't know what the decision-making process is. You don't know what the effect on discipline would be. In Bond, for instance, let's just hypothesize for just a moment. Suppose, Bond, the negligence was simply that the active-duty sailor operating the motorboat was not acting in the best tradition of the United States Navy and running over a canoe. And if that's it, there's no connection at all with military discipline or military decisions. But if it is that the government, if the allegations were that the government should never have rented out that motorboat to that particular class of operator, or maybe that the government should not have rented out motorboats to anybody, those involve a broad range of military decisions. And that would have an effect on military discipline. You'd be questioning the orders coming down from the lieutenant, lieutenant commander, commander captain, all the way on up as far as how they set up this program and decided to operate it. I think it's crucial to know what the kind of negligence was. Then you'll know how much involvement there was by the government. All right. I wish I had a year. All right. Well, thank you both for your excellent and helpful arguments. This matter will now stand submitted. Thank you. Thank you. The next matter on calendar is United States of America v. David Lang Acana, case number 06-10152. That matter is submitted on the breaks and will be submitted as of this date. United States of America v. Leonel Ernesto Villasenor, case number 06-10159. And that matter is submitted on the briefs and is submitted as of this date. Frances Barnett v. Cigna Healthcare, case number 05-15081.
judges: T.G. Nelson, Gould, Callahan